**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JENNIE NICASSIO,            )
                                    )
        Plaintiff,       )
                                    )     Civil Action No. 17-805
        v.             )     Judge Nora Barry Fischer
                                    )
VIACOM INTERNATIONAL, INC., and )
PENGUIN RANDOM HOUSE LLC,   )
                                    )
        Defendants.    )
                                    )

## <u>MEMORANDUM OPINION</u>

### I. INTRODUCTION

In this case, Plaintiff Jennie Nicassio alleges that Defendants Viacom International, Inc. ("Viacom") and Penguin Random House LLC ("Penguin") are liable to her for copyright infringement, unfair competition, tortious interference with prospective advantage, and tortious destruction of intellectual property. (Docket No. 1). Pending before the Court is Defendants' joint motion to dismiss the complaint, with prejudice, for failure to state a claim. (Docket No. 18). After careful consideration of the parties' briefs and oral arguments, and for the following reasons, the Court will GRANT the motion [18] and dismiss the complaint, with prejudice.

### II. FACTUAL ALLEGATIONS

Nicassio is an author of illustrated children's books, including *Rocky: The Rockefeller Christmas Tree* ("*Rocky*"), which is the story of a young Christmas tree that dreams of becoming the Rockefeller Center Christmas tree in New York City. (Docket No. 1 at ¶¶ 2, 10). In 2007, Nicassio copyrighted *Rocky* when it was still unpublished. (*Id.* at ¶ 13). After becoming available for purchase on Amazon in July 2009, *Rocky* quickly rose to the highest selling children's book in the site's holiday category. (*Id.* at ¶¶ 14, 17). In November 2009, Nicassio published *Rocky* with

On-Demand Publishing LLC, d.b.a. CreateSpace Independent Publishing Platform; and, she switched to Indigo Sea Press in 2015. (*Id.* at ¶¶ 14, 15). In all, Nicassio has released three editions of *Rocky*, with the most current version having been released in May 2016. (*Id.* at ¶ 16).

Because Nicassio was interested in adapting *Rocky* into an animated film or show, she sent copies of the book to numerous entertainment agencies and companies for evaluation between 2011 and 2016, including Liza Royce Agency LLC, Frederator Networks, Inc., David Higham Associates, and Defendant Viacom. (*Id.* at ¶ 18). In this process, Nicassio claims that Viacom gained access to and knowledge of her copyrighted material and content in *Rocky*. (*Id.* at ¶¶ 19-21).

In August 2016, Nicassio submitted *Rocky* to the Top of The Rock gift store to be approved and stocked, and she separately executed an agreement with Lightning Source, Inc., a print on demand company, for the manufacture and distribution of paper copies. (*Id.* at 22, 23). A month later, Penguin published *Albert: The Little Tree With Big Dreams* ("*Albert*"), an illustrated children's book. (*Id.* at ¶¶ 3-4, 24-25). Nicassio claims that *Albert* mirrors the story of *Rocky*, as it too "tells the tale of a young Christmas tree that wishes to one-day stand in a big city" and otherwise "contains substantial material copied from" *Rocky*. (*Id.* at ¶¶ 25, 26).

Following Penguin's publication of *Albert* in September 2016, sales of *Rocky* declined. (*Id.* at ¶ 33). By the end of 2016, *Rocky* had fallen from the number one selling holiday children's book on Amazon to number ten. (*Id.* at ¶ 33). During this time period, Nicassio received interest from Hallmark and "hoped to negotiate the sale of the exclusive rights to *Rocky* to Hallmark for the 2017 holiday season." [1] (*Id.* at ¶ 34). Meanwhile, in November 2016, Defendant Viacom began

---

[1]      Although the complaint does not actually specify whether this occurred, Nicassio argues in opposition to the pending motion that this allegation alone proves that Defendants intentionally interfered with her prospective contractual relationship for purposes of her tortious interference claim. (Docket No. 32 at 24).

advertising a film adaptation of Penguin's *Albert*. (*Id.* at ¶ 35). According to the complaint, Viacom's animation of *Albert*, like Penguin's book, "contains substantial material probative of copying of *Rocky*." (*Id.* at ¶ 36).

Nicassio first learned of Viacom's animation of *Albert* on December 5, 2016 when she saw a television advertisement for it. (*Id.* at ¶ 38). She discovered that Penguin published *Albert* as a children's book four days later. (*Id.*). Viacom's animation of *Albert* aired on Nickelodeon each day from December 9, 2016 to January 2, 2017, which the complaint avers not only generated significant advertisement revenue for Viacom through its on-air sponsorships but also caused *Albert* to surpass *Rocky* and become one of the highest selling holiday children's books of the season. (*Id.* at ¶¶ 37 39-41). At the same time, sales of *Rocky* sharply declined and it failed to meet projections, notwithstanding that it was advertised on Amazon as "Book of The Day." (*Id.* at ¶ 41).

In early 2017, Viacom generated additional revenue from its animation of *Albert* by making it available on several other platforms,[2] and Nicassio further alleges that Viacom plans to produce three additional *Albert* holiday film specials in the future. (*Id.* at ¶¶ 42-43). Based on Penguin's and Viacom's alleged copying of *Rocky*, the complaint claims that Nicassio has sustained damage and injury to her business, goodwill, reputation and profits in an amount not presently known. (*Id.* at ¶ 44). In addition, Nicassio claims that Defendants' conduct has resulted in actual confusion among consumers, as evidenced by customer reviews on Amazon and experienced by her at book signings for *Rocky*. (*Id.* at ¶ 45). The complaint also points out that a Google search for Nicassio's *Rocky* purportedly yields results for Viacom's animation of *Albert*. (*Id.* at ¶ 36).

---

[2]    As listed in the complaint, such platforms included: Amazon.com, Nick.com, the Nick App, iTunes.com, Microsoft.com, Google Play, the Playstation store, Nick on Demand, and Vudu.com. (Docket No. 1 at ¶ 42).

## II.     PROCEDURAL HISTORY

Nicassio initiated this action against Viacom and Penguin on June 17, 2017, asserting the following counts: (I) copyright infringement – book publications (against Penguin only); (II) copyright infringement – film production (against Viacom only); (III) unfair competition under the Lanham Act and state law; (IV) state law tortious interference with prospective advantage; and (V) state law tortious destruction of intellectual property. (Docket No. 1). Penguin and Viacom responded to the complaint by filing a joint motion to dismiss and brief in support on November 6, 2017. (Docket Nos. 18, 19). After being granted multiple extensions, Nicassio filed her brief in opposition on January 9, 2018, (Docket No. 32), and Defendants filed their reply on February 2, 2018. (Docket No. 34). The Court convened oral argument on March 12, 2018. (Docket No. 41). At the close of argument, the parties declined to submit supplemental briefing, but the Court permitted Nicassio to file the color version of the PowerPoint slides utilized during argument, (*id.*), which she did on March 14, 2018. (Docket No. 42).[3] Accordingly, the motion is fully briefed and is ripe for disposition.

## III.    LEGAL STANDARD

A court may dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion, the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

The plaintiff must plead "enough factual matter" to "'nudge [his or her] claims across the line from conceivable to plausible.'" *Phillips*, 515 F.3d at 234-35 (quoting *Bell Atl. Co. v.*

---

[3]     The transcript of the oral argument was subsequently filed on March 27, 2018. (Docket No. 43).

*Twombly*, 550 U.S. 544, 556, 570 (2007) (alteration in original)). All that is required is that the plaintiff's complaint "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation omitted), in order to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (alteration in original)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678.

When reviewing the sufficiency of a complaint, the trial court must undertake three steps. *Connelly v. Lane Const. Corp*., 809 F.3d 780, 787 (3d Cir. 2016). "First, it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.'" *Id*. (quoting *Iqbal*, 556 U.S. at 675) (alterations in original). "Second, it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id*. (quoting *Iqbal*, 556 U.S. at 679). "[T]he clearest indication that an allegation is conclusory and unworthy of weight . . . is that it embodies a legal point." *Id*. at 790. "Finally, '[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Id*. at 787 (quoting *Iqbal*, 556 U.S. at 679) (alterations in original).

In addition, the Court may consider an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Ctr. Prop., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1993). In the context of copyright infringement claims, the Court may consider the works submitted by the parties, so long

as there is no challenge as to authenticity. [4] *Winstead v. Jackson*, 509 Fed. App'x 139, 143 (3d Cir. 2013).

## IV. DISCUSSION

### 1. Copyright Infringement Claims – Counts I and II

The Court begins its analysis by addressing Nicassio's copyright infringement claims set forth in Counts I and II of her complaint. (Docket No. 1). To state a claim for copyright infringement, the plaintiff must allege ownership of a valid copyright, and unauthorized copying of protectable elements of the plaintiff's work. *See Dun & Bradstreet Software Servs. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir.2002). At this stage of the case, Defendants do not challenge whether Nicassio sufficiently pled ownership of a valid copyright or access. (Docket No. 19 at 11 n. 6). Instead, Defendants only dispute that the complaint adequately pleads that they copied protectable elements of *Rocky*. (*Id.*). For purposes of the pending motion, therefore, the dispositive issue is whether there are "substantial similarities" between *Rocky* and *Albert*. *See Dam Things from Denmark v. Russ Berrie & Co., Inc.*, 290 F.3d 548, 561 (3d Cir. 2002).

The substantial similarity inquiry is made from the perspective of a "lay-observer," *Whelan Assocs., Inc. v. Jaslow Dental Lab, Inc.*, 797 F.2d 1222, 1231-32 (3d Cir. 1986), and calls on the Court to ask "whether the later work is similar because it appropriates the unique expressions of the original author, or merely because it contains elements that would be expected when two works explore the same idea or explore the same theme." *Kay Berry, Inc. v. Taylore Gifts, Inc.*, 421 F.3d 199, 208 (3d Cir. 2005). This is because "[i]t is a fundamental premise of copyright law that an author can protect only the expression of an idea, but not the idea itself." *Id.* (citations omitted). As a result, a copyright infringement claim will generally fail if the work contains only a minimal

---

[4] As explained below, both Nicassio and Defendants provided the Court undisputedly authentic copies of the works.

amount of original expression, given that the author claiming copyright infringement is tasked with pointing to aspects of the work embodying her creative contribution. *Id.* In the same vein, "*scenes a faire*, sequences of events that 'necessarily result from the choice of a setting or situation," do not enjoy copyright protection. *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996). Although Nicassio repeatedly refers to the *scenes a faire* doctrine as being some "exception" that applies only if the similarities are literally *indispensable* to the theme, (*see* Docket No. 32 at 1, 6, 15, 16, 18), it is "merely a restatement of the hypothesis … that the purpose or function of a work or literary device is part of that device's 'idea' (unprotectable portion)." *Whelan*, 797 F.2d 1222, 1236 (3rd Cir. 1986). Accordingly, the *scenes a faire* doctrine, rather than being an exception, simply provides "that anything necessary to effecting that function is also, necessarily, part of the idea, too." *Id.* In other words, *scenes a faire* applies not only to situations and incidents that necessarily flow from the basic plot premise, but also ones that *naturally* flow from it. *Cavalier v. Random House, Inc.,* 297 F.3d 815, 823 (9th Cir.2002).

Still, as Nicassio notes, "[t]he particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element," even where the same proffered similarities are not protectable on their own. *Metcalf v. Bochco,* 294 F.3d 1069, 1074 (9th Cir. 2002). At the same time, "random similarities scattered throughout the works" are not protectable. *Williams*, 84 F.3d at 590 (quoting *Lichtfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)). "Such a scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Id.* Consequently, when the works only share generic plot and theme ideas, and not any other protectable expressions, they are not substantially similar as a matter of law. *See Tanikumi*, 616 Fed. App'x at 520-21 (rejecting the plaintiff's

argument that her two autobiographical works were substantially similar to Disney's *Frozen* based on "many tens, perhaps more than 100, points of identical characters, events, mishaps, emotions and words and phrases that are found in both [her] works and Defendants' *Frozen*," including "a mountain setting, an intense sisterly bond, an untrue lover, and a resolution in which the female protagonist comes into her own without the help of a man," because "the similarities between the works … concern prototypical settings, plots, and characters too indistinct to merit copyright protection") (citing *Cavalier,* 297 F.3d at 828 (explaining that children's television series was not substantially similar to the authors' copyright works despite similarities in themes, including teaching children to overcome their fears and having magical adventures because such themes are standard topics in children's literature); *Williams,* 84 F.3d at 588–89 (2d Cir.1996) (holding that motion picture Jurassic Park was not substantially similar to children's book Dinosaur World because nearly all similarities arise from non-copyrightable elements such as a dinosaur zoo)).

Nicassio objects that it is premature for the Court to conduct the substantial similarity inquiry because it involves a question of fact. (Docket No. 32 at 7.) Even so, the Court may address this issue at the pleading stage because the works themselves supersede and control any contrary descriptions of them. *Peter F. Gaito Architecture, LLC v. Simone Developmental Corp*, 602 F.3d 57, 63 (2d Cir. 2010). Indeed, "no discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works." *Tanikumi*, 616 Fed. App'x at 518 (quoting *Peter F. Gaito*, 602 F.3d at 63-64 (2d Cir 2010) (internal marks omitted)). To this end, the Court compares the works' "total concept and overall feel … as instructed by good eyes and common sense" for the purpose of ultimately determining "whether the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged the elements of his or her work." *Peter F. Gaito*, 602 F.3d at 66 (internal citation and marks omitted); *see also Tanksley*

*v. Daniels*, 259 F.Supp.3d 271, 281 (E.D. Pa. 2017) ("In analyzing the two works for substantial similarity, the court compares aspects such as plot, characters, theme, mood, setting, and dialogue.").   As there is no challenge as to the authenticity of the works submitted by the parties, the Court proceeds to summarize them.  *See Winstead*, 509 F. App'x 139 at 143.

## A.  Nicassio's *Rocky*[5]

*Rocky* is the story of a Norway Spruce who "longed to be the Rockefeller Christmas Tree," notwithstanding that "his branches were bare and bent the wrong way" and "his needles were hardly ever green."  Other animals in the forest, including AJ the squirrel and Mrs. Pickles the skunk, mocked Rocky for this dream, which made tears "r[u]n down his twisted branches."  Later that night when Rocky was sleeping, the tallest tree in the forest, Bruce Spruce, who, like Rocky, was a Norway Spruce, appears with AJ the squirrel to confront Rocky.  Bruce Spruce advises Rocky to withdraw from the annual Rockefeller Center Christmas Tree contest because, according to Bruce, he does not have chance to win.

Then a "wood fairy" named Mary Louise arrives, telling Bruce to leave Rocky alone.  Bruce and AJ depart, although they continue to mock Rocky as they leave.  Mary Louise proceeds to offer Rocky words and encouragement and even tries to make him laugh.  Rocky asks her if she is enchanted and could use her magic to make him "handsome and strong like Bruce Spruce and the mighty white pine."  Mary Louise responds: "There is no such thing as magic.  You just have to believe."

These words motivate Rocky to drink more water and be more positive.  He starts telling

---

[5]         The following summary of *Rocky* is based on the scanned PDF copies of *Rocky* located at Defendants' Exhibit B and Plaintiff's Exhibit D.  (Docket Nos. 21-2, 32-4).  Although Nicassio has attached additional copies of the prior editions of *Rocky* to her brief in opposition, (Docket Nos. 32-1-3), the substantial similarity theory set forth in her complaint and legal arguments is based on the version being referenced by the Court.

himself every day that he is "tall and fluffy and green." In just a short time, Rocky grows twice in size, develops "lush, dark green branches," and is beaming with "new found confidence." The other animals in the forest notice the transformation, but are suspicious that Mary Louise used her magic to put a spell on Rocky, so they report their theory to Bruce. Once Bruce observes Rocky practicing standing tall for the contest, he too is convinced that Mary Louise used magic to make Rocky grow.

Worried that he will lose to Rocky, Bruce conspires with AJ "to catch the fairy and make her change Rocky back." Bruce and AJ capture Mary Louise by using a net of twigs. Bruce screams at her: "You used magic on Rocky! Change him back or when I come back I'm tearing down your house!" Bruce then leaves to enter the competition. Meanwhile, AJ holds Mary Louise captive behind a snow mound. Mary Louise denies to AJ that she used magic to make Rocky grow. Rather, she explains that she merely "told Rocky to believe in himself and anything would be possible." Satisfied with her explanation, AJ frees Mary Louise, "just in time to watch all the trees being judged."

The judges pass overhead in red helicopters to decide which tree will be chosen. After looking at all of the contestants, they pick Rocky, proclaiming, "[w]e found the perfect tree!" Rocky is decorated with ornaments and twinkling lights and displayed at Rockefeller Center. Thousands gather to admire him, and Mary Louise places a star high on Rocky's top. "It was Rocky's happiest day!"

### B. Defendants' *Albert*[6]

*Albert* begins in Earth Mama's plant nursery which is filled with holiday cheer. Albert,

---

[6] Unless otherwise noted, the following summary applies to both *Albert* the book and the animation. The summary is based on the scanned PDF copies of the book located at Defendants' Exhibit C and Plaintiff's Exhibit E. (Docket Nos. 21-3, 32-5).

a tiny potted Douglas fir, is part of the family of plants in the nursery. He loves Christmas but grows sad each year as he watches "all the big trees outside go home with happy families." Convinced that he is destined for something more, Albert jumps off his shelf and races for the door to leave. However, as he is on his way, he is spotted on the ground by Earth Mama, who asks: "What in the world is this pip-squeak doing down here?" Earth Mama's granddaughter Molly picks Albert off the ground and places him back on the shelf. Molly comforts him, saying, "it's okay to be small, as long as it doesn't stop you from doin' big things." Then Molly's father, Donny, tells her that it is time to deliver the trees to "Baker's Hill before the Empire City Christmas show in New York."

Almost suddenly, Albert hears an announcement on the television that tomorrow, in Baker's Hill, Vermont, "one special tree, oozing with Christmas spirit, will be chosen as this year's Empire City Christmas Tree – the most famous Christmas tree in the world!" Eager to be selected, Albert sneaks a ride to Baker's Hill with Donny and Molly, as well as his two friends: Gene, a stink-breath weed, and Maisie, an encouraging potted palm tree. Along the way to Baker's Hill, Donny and Molly make a pit stop at a restaurant called Cactus Pete's.

At the stop, Albert hears a voice screaming for help from beneath the snow, so he gets out of the truck and starts digging. Albert soon learns that the voice was coming from Cactus Pete himself. Cactus Pete angrily complains to Albert, Maisie, and Gene that every year he is replaced in the restaurant by a Christmas tree. Upon learning that Albert aspires to be this year's Empire City Christmas Tree, Pete and "his ragtag band of cacti chased after Albert, Maisie, and Gene, blasting spiky needles in every direction!" Albert and his friends, however, escape from Pete (temporarily, at least) by flattening him behind a dumpster.

When Albert and his friends return to the restaurant, they discover that Donny and Molly

have already left. Albert, however, remains determined to continue to Baker's Hill. Just then, he and his friends see a truck with what appears to have "BAKER'S HILL" painted on the side pass by, so they hop aboard. Soon thereafter, the truck dumps them on a conveyor belt and they quickly realize they made a mistake. They are not at Baker's Hill but instead are at Baker's Mill – a paper mill where they are about to be mulched. To make things worse, they discover that "Cactus Pete had survived the dumpster smash and followed them" to the truck. Pete began shooting spikes at them again but was defeated when he "rolled straight into the chipper." It looks like Albert and Maisie are next, but at the very last second, Gene the stink-breath weed pulls the emergency lever to stop the belt and save them.

Albert and his friends proceed to a nearby forest in search of Baker's Hill but are chased by several vegetarian bunnies who are trying to eat them. They elude the bunnies by jumping into a log and sliding down a hill, which comes to a stop right in front of a news van. They made it to Baker's Hill just in time for the tree selection. The man from the news exclaims: "This is it everyone! We've found our tree!" At first, Albert is overjoyed, thinking the man is referring to him; however, he becomes deflated once he realizes the man selected the eighty-foot evergreen named Big Betty behind him.

As Maisie comforts Albert, he notices that Cactus Pete – who is mangled from the wood chipper but still alive – hitched a ride on Betty's truck. Unwilling to let Pete ruin Christmas, Albert, Maisie, and Gene catch a ride to Empire City to stop Pete (in a news van in the book, and in a red helicopter in the film). When they arrive, they see Pete shoot a spike at the crane operator who was in the process of putting the famous star on Betty. This causes the operator to slice Betty's top off with the star. The large crowd is heartbroken, as there is now nowhere to place the star on Betty. But, Albert remembers Molly's words of encouragement from the nursery: "It's

okay to be small, as long as it doesn't stop you from doin' big things." So, with the help of the crowd, Albert is decorated and the crane operator hoists him atop of Betty, at which point the famous star is placed on his head. "He had become the most famous Christmas tree in the world!"

When Albert sees Maisie and Gene waving goodbye, however, he realizes that he misses his family at the nursery. Albert also spots Cactus Pete in the crowd and recognizes that Pete does not hate Christmas; he just hates being left out. Albert thus trades places with Pete, and Pete begins to joyfully sing on top of Betty. Albert, Maisie, and Gene smile at Pete and return home to the nursery, where they are welcomed by Jaws the Venus flytrap. The story ends with Molly placing a star on Albert, which causes him to smile back brightly at her.

### C. The Works are Not Substantially Similar

Having summarized *Rocky* and *Albert*, the Court concludes that the works are not substantially similar as a matter of law. In the complaint, Nicassio alleges that the following aspects of the two works are substantially similar:

- The covers of both books feature an illustrated Christmas tree in a red base dressed with a star, set in a big city environment;

- In *Albert*, the protagonist tree and his plant friends assemble in a nursery to discuss his dreams of becoming the famous Empire City, New York Christmas tree. In *Rocky*, the protagonist tree and his animal friends assemble in a forest to discuss his dreams of becoming the famous New York City Christmas tree;

- Each story features a young imperfect Christmas tree that strives to be on display in New York;

- Albert and Rocky are bullied for being imperfect and are comforted by a character, which Nicassio claims, have "strikingly similar" names: Mary Louise in *Rocky*, and Maisie in *Albert*;

- Each story features a plant antagonist: Bruce Spruce in *Rocky* and Cactus Pete in *Albert*. Bruce bullies Rocky with the help of his animal friends, and Cactus Pete bullies Albert with the help of his plant friends;

- In each story, a "special" tree is chosen to be displayed in New York;

- Rocky and Albert are put on display in New York and a star is placed on their heads in celebration as a large crowd watches, Rocky as a grown up tree and Albert as the top portion of another decapitated tree;

- Each story involves interactions with people in the forest;

- The back cover of the 2011 version of *Rocky* states: "An unlikely evergreen dreams of becoming the famous Rockefeller Christmas Tree in New York City! Come along with Rocky, Mary Louise, AJ, Mrs. Pickles, and Bruce Spruce to the magical city!" The back cover of *Albert* states: "Albert is a little tree with giant Christmas dreams. Follow him and his friends on a holiday adventure to the big city!";

- Each story involves interactions between plants and animals. In addition, page seven of the 2011 version of *Rocky* reads, "[a]ll the animals in the forest loved December." Page two of *Albert* states, "no one loved Christmastime more than the plants...";

- An individual in each story announces the winner in similar fashion. In the 2016 version of *Rocky*, a judge exclaims "we found the perfect tree!" In *Albert*, a newscaster exclaims "we've found our tree!";

- *Rocky* states, "now Rocky was going to be the most famous Christmas tree in the world…" *Albert* states, "he had become the most famous Christmas tree in the world!"; and,

- Both *Rocky* and Viacom's animation of *Albert* feature a red bubble helicopter. In *Rocky*, the judges fly overhead to rate the trees. In *Albert,* Albert and his friends hitch a ride to Empire City in the helicopter.

(Docket No. 1. at ¶¶ 27-32, 36).

Notwithstanding these similarities, Defendants seek dismissal of Nicassio's copyright infringement claims, contending that "the generic plot idea of a little Christmas tree with dreams of being on display in *not* protectable, and does nothing to support a claim of copyright infringement." (Docket No. 19 at 16) (emphasis in original). Defendants further contend that, despite sharing the same basic story concept, *Rocky* and *Albert* are entirely dissimilar in their protectable expression, when considering all of the relevant factors. (*Id.* at 16-21). But, according to Nicassio, the works are substantially similar, and the *scenes a faire* doctrine does not apply, because her "originality in expressing the theme of perseverance by making the character a tree

aspiring to be the Rockefeller Center Christmas tree" does not flow from a "commonplace" idea. (Docket No. 32 at 15, 19). In her view, a tree with "a dream of success" that actually becomes a hero "is an uncommon happenstance in literature," even in the context of a holiday story. (*Id.* at 9). The same holds true, Nicassio contends, with respect to her inclusion of a female figure encouraging the tree, a tree being portrayed with a five-pointed gold star "against a skyscraper with a monochromatic gray-purple sunset," and a tree becoming the "most famous Christmas tree in the world." (*Id.*). Nicassio's line of argument, however, misses the mark.

Regardless of whether the basic plot idea of a little tree aspiring to be the Rockefeller Christmas Tree in New York is "commonplace," it is far too generic to be considered protectable under copyright law. *Tanikumi*, 616 Fed. App'x at 521 (generic plot and theme ideas are not protectable). Nor are the themes of perseverance, adversity, or encouragement in a children's story protectable. *See, e.g., Cavalier*, 297 F.3d at 828 ("The themes of teaching children to have confidence, to overcome their fears, and to try are … too general to be protected."). As such, Nicassio cannot circumvent dismissal by conjuring up a host of hypothetical ways that Defendants could have told *Albert* differently, such as by using other characters, themes, or expressions. (Docket No. 32 at 8-11).[7] This tactic ignores the fundamental rule that not all copying is copyright infringement, *Feist Pub., Inc. v. Rural Tel. Svc. Co.*, 499 U.S. 340, 361 (1991), and "fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another." *Williams*, 84 F.3d at 590.

Again, *Rocky* is the story of an imperfect Norway Spruce who reaches his dream of being

---

[7] For example, rather than having a tree as the main character in *Albert*, Nicassio contends that "the protagonist could just as easily have been one of Santa's elves, a reindeer, a holiday wreath or a child." (Docket No. 32 at 8). She also postulates that there were several other ways for Defendants to pursue the themes of perseverance, adversity, and encouragement, without having the protagonist's friend be in danger, featuring a red bubble-shaped helicopter, giving the trees the same "eyebrow expression," or referring to New York City as "Empire City." (*Id.* at 8-10).

selected as the Rockefeller Christmas Tree, despite being mocked and intimidated by three antagonist bullies (Bruce Spruce, AJ the squirrel, and Mrs. Pickles the skunk), because he follows the encouragement of a fairy and begins to believe in himself and drink plenty of water, causing him to grow twice in size and transform from a tree with bare and bent branches without much green color to a tree with "lush, dark green branches." The basic theme of *Rocky* is that anything can be accomplished with perseverance and positive thinking. Admittedly, *Albert* shares this theme. (Docket Nos. 19 at 17, 34 at 7-10). Yet, *Albert* explores other themes not present in *Rocky* (*e.g.,* the importance of family, empathy, and forgiveness), and it does so by employing plot twists, sequences, and expressions in a way that has no resemblance to *Rocky*.

In this regard, although *Rocky* and *Albert* each contain instances of verbal bullying, Albert overcomes additional obstacles to achieve his goal, mainly escaping from the violent bully Cactus Pete twice, evading a pack of hungry vegetarian bunnies, and suffering defeat when Big Betty is selected as the Empire City Christmas tree. Only after soldiering on to Empire City to stop Cactus Pete from ruining Christmas does Albert become the most famous Christmas tree in the world. In fact, the way Albert achieves this fame – being placed on top of Betty, an 80-foot evergreen with a severed top – stands in stark contrast to how Rocky is merely selected as the contest winner. Also, unlike *Rocky*, once Albert reaches his goal, he realizes that family is more important than being the most famous Christmas tree in the world. He then discovers that Pete was only trying to ruin Christmas because he was lonely, so he trades places with Pete and returns home to spend the holiday with his family at the plant nursery. Hence, it is more than clear that the protectable aspects of the works' plots, themes, and sequences are not substantially similar. *See Tanikumi,* 616 Fed. App'x at 520-21; *see also Winstead v. Jackson,* 509 Fed. App'x at 143 (affirming the district court's dismissal of a copyright infringement claim where the similarities in the works' themes and settings were "not unique" to that particular genre).

Nor are the works' characters substantially similar. When comparing characters, the Court evaluates the "totality" of their "attributes and traits as well as the extent to which the defendants' characters capture the 'total concept and feel' of figures in [plaintiff's work]." *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F.Supp.2d 200, 208 (S.D.N.Y. 2010) (quoting *Hogan v. DC Comics,* 48 F.Supp.2d 298, 309-10 (S.D.N.Y. 1999)). With respect to the protagonists, Nicassio calls attention to unremarkable similarities that one would expect in any children's story about an animated Christmas tree: a red base, a gold star, and eyebrow expressions. (Docket Nos. 1 at ¶¶ 27, 36; 32 at 7, 10). Simply put, by relying on such common features, Nicassio falls short of meeting the applicable standard for substantial similarity in a character. *See Kaye v. Cartoon Network, Inc.*, ___ F.Supp.3d ____, 2017 WL 5197152, at *5 (S.D.N.Y. 2017) (explaining that "[t]he bar for substantial similarity in a character is set quite high"); *see also Whitehead v. Paramount Pictures Corp.*, 53 F.Supp.2d 38, 50 (D.D.C. 1999) ("general characteristics such as black hair, intelligence, patriotism, and slight paranoia … are not copyrightable and do not establish substantial similarity"); *Jackson v. Booker*, 465 Fed. App'x 163, 165 (3d Cir. 2012) (no substantial similarity between characters who "both were African-American males and ex-convicts who become community activists"). What Nicassio fails to grasp here is that aside from sharing such basic characteristics, Rocky and Albert differ in type, size, and overall look. To this end, Rocky is initially a smaller, colorless Norway Spruce with bare and bent branches who doubles in size and develops dark, lush branches; whereas Albert remains a three-foot tall potted Douglas with only six branches stemming from a wood center the entire story. *See* (Docket No. 32 at 10) (displaying pictures of Rocky and Albert).

The other characters in the works are even more distinct. As Defendants point out, *Albert* has no fairy, speaking animals, or spruce trees, and the antagonists, other than both being bullies,

share few common traits. (Docket No 19 at 17-18). Stock characters, such as sidekicks and antagonists, are not copyrightable. *DiTocco v. Riordan*, 815 F.Supp.2d 655, 668 (S.D.N.Y. 2011), *aff'd* 496 Fed. App'x 126 (2d Cir. 2012). Thus, the fact that both works have such characters, without more, is insufficient to establish a viable claim for copyright infringement. *Tanksley*, 259 F.Supp.3d at 290.

The Court acknowledges some similarity between the works as identified by Nicassio, including, most notably, their use of the phrase: "the most famous Christmas tree in the world," and having the trees displayed before a large crowd in a setting resembling Rockefeller Center in New York City. (Docket No. 1 at ¶¶ 27, 31). Nevertheless, these similarities are, at most, a "random scattershot" of various aspects of the works which "would be expected when two works express the same idea or explore the same theme." *Williams*, 84 F.3d at 590; *Kay Berry,* 421 F.3d at 208. Even if, as Nicassio insists, the identified similarities are not "indispensable" to conveying this basic theme, the works' "total concept and overall feel … as instructed by good eyes and common sense" would not lead a lay observer to conclude that Defendants' alleged copying, if proven, was of protectable aspects of *Rocky*. *Peter F. Gaito*, 602 F.3d at 66; *Dam Things*, 290 F.3d at 562; *see also Williams,* 84 F.3d at 589 (explaining that consideration of the works' total concept and feel is especially appropriate when comparing children's works, which are "often less complex than those aimed at an adult audience"); *Cavalier*, 297 F.3d at 824 ("[T]he general premise of a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall asleep … [is] not protected by copyright law."). As in *Tankiumi,* "[w]hile there are indeed certain similarities between the works, they concern prototypical settings, plots, and characters too indistinct to merit copyright protection." *Tanikumi*, 616 Fed. App'x at 521.

Therefore, Nicassio has failed to state a claim for copyright infringement against Defendants at Counts I and II of her complaint.

## 2. Unfair Competition Claims – Count III

At Count III, Nicassio asserts an unfair competition claim against Defendants under both Section 43(a) of the Lanham Act and state law. (Docket No. 1). Nicassio rests this claim on an unadorned, conclusory allegation that Defendants "have used and continue to use their infringing publications in connection with sales, offering for sale or distribution, advertising and promotion of goods that is likely to cause confusion or mistake or to decieve [*sic*] purchasers as to the source of orgin [*sic*] of such goods, and/or as intentionally have acted to deceive, and have deceived consumers in making infringing sales of their *Albert* products." (Docket No. 1 at ¶ 60). Defendants maintain that this claim, as it relates to Section 43(a) of the Lanham Act, is barred by the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). (Docket Nos. 19 at 21-22, 34 at 13).

Section 43(a) of the Lanham Act provides, in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, (A) which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person… shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). "In *Dastar*, the [Supreme] Court emphasized that 'origin' [in Section 43 of the Lanham Act, codified at § 1125(a)(1)] could refer to either 'geographic origin' or 'to origin of source or manufacture' but rejected the argument that the term origin could 'be stretched'

to include broader concepts of origin such as 'the creator of the underlying work,' or 'the author of any idea, concept, or communication embodied in those goods.'"  *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 229 (3d Cir. 2017) (internal citations omitted).  Stated differently, *Dastar* rejected the notion that Section 43(a) of the Lanham Act "creat[es] a cause of action for, in effect, plagiarism."  *Dastar*, 539 U.S. at 37; *see also Fair Wind Sailing, Inc. v. Dempster,* 764 F.3d 303, 308-09 (3d Cir. 2014) (citing *Dastar* to explain the Lanham Act "does not shield businesses from plagiarism").

Nicassio advocates that *Dastar* does not bar her Lanham Act claim because that case, unlike this one, dealt with an *uncopyrighted* work already in the public domain.  (Docket No. 32 at 23); *Dastar*, 539 U.S. at 26.  Yet, she does not support her argument with any case law distinguishing *Dastar* on this basis, and her position is contrary to persuasive decisions from lower federal courts applying *Dastar* to copyrighted works.  *See, e.g., Narrative Ark Entertainment LLC v. Archie Comic Publications, Inc.*, 2017 WL 3917040, *5 (S.D.N.Y. 2017) ("As other courts in this District considering this question have concluded, *Dastar's* holding barring Lanham Act claims premised on the false designation of the origin of ideas, concepts, or communications embodied in tangible goods, does not turn on whether the work is still under copyright protection or in the public domain.").  Nicassio's attempt to salvage this claim by arguing that her complaint contains allegations of confusion to the general public based on the language on the covers and in the text of the works[8] fares no better.  *See Quadratec, Inc. v. Turn 5, Inc.*, 2015 WL 4876314, *9 (E.D. Pa. 2015) (rejecting the plaintiff's argument that its unfair competition claim was viable because the defendant's product presentations were likely to cause confusion based on *Dastar*).

---

[8]    For example, Nicassio calls attention to "the use of such common language as 'most famous Christmas tree in the world,' 'dream,' etc."  (Docket No. 32 at 23).

On a related note, Nicassio's state law unfair competition claim is preempted by Section 301 of the Copyright Act, irrespective of whether New York or Pennsylvania law applies.[9]  The Copyright Act provides for a number of exclusive rights, including the right to distribute, reproduce, and display a work, as well as the right to produce derivative works.  17 U.S.C. § 106. Section 301 preempts only those state law rights which may be abridged by an act that itself would infringe on one of these exclusive rights.  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir.2004) (citing *Computer Assocs. Int'l v. Altai*, 982 F.2d 693 (2d Cir.1992)). Defendants correctly argue that this claim is subject to dismissal because it is not qualitatively different from a copyright infringement claim under the "extra element" test.  (Docket Nos. 19 at 22; 34 at 13).

The "extra element" test has developed in the federal courts to determine this question of equivalence.  *See Dun & Bradstreet*, 307 F.3d at 217 (citing *Data Gen. Corp. v. Grumman Sys. Supp. Corp.*, 36 F.3d 1147, 1164 (1st Cir. 1994)).  Under this test, "if a state cause of action requires an extra element, beyond mere copying, preparation of derivative works, performance, distribution or display, then the state cause of action is qualitatively different from, and not subsumed within, a copyright infringement claim and federal law will not preempt the state action."  *Id.*  "Not every extra element is sufficient to establish a qualitative variance between rights protected by federal copyright law and that by state law."  *Id.*  Courts take a "restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim."  *Briarpatch*, 373 F.3d at 306 (citation omitted).

---

[9]        Because there is no conflict between the laws of New York and Pennsylvania in this regard, a choice of law analysis is unnecessary here.  *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007).

In response to Defendants' preemption argument, Nicassio does not even attempt to articulate how her state law unfair competition claim requires an "extra element." (Docket No. 32 at 24).[10] Rather, she vaguely contends, without elaboration, that Defendants' argument here is "defective." (*Id.*). Based on her inclusion of a single parenthetical citation in her brief, it appears to the Court that Nicassio is possibly arguing that the unfair competition claim is not preempted by the Copyright Act because it involves "passing off." (*Id.*).[11] To the extent that she is making such an argument, it is without merit.

"A state law unfair competition claim that alleges the tort of 'passing off' is *not* preempted because such a claim alleges an extra element of deception or misrepresentation that is not necessary for a cause of action for copyright." *Fun-Damental Too, Ltd. v. Univ. Music Group, Inc.*, 1997 WL 381608, *5 (E.D. Pa. 1997) (emphasis in original). "Passing off … occurs when a producer misrepresents his own goods or services as someone else's." *Dastar*, 539 U.S. at 28 n. 1. "Reverse passing off," by contrast, occurs when "the producer misrepresents someone else's goods or services as his own." *Id.*

Here, Nicassio's allegations are akin to "reverse passing off," as opposed to passing off, because the crux of her case is that Defendants' work (*Albert*) copies her work (*Rocky*) without her permission and by claiming the contents of her work as their own. *See Daley v. Firetree, Ltd.*, 2006 WL 148879, *4 (M.D. Pa. 2006) ("reverse passing off" occurs when "A" copies "B's" work without permission and claims it as "A's" own). Given same, her state law unfair competition

---

[10]     Nicassio inexplicably makes this argument in the section of her brief pertaining to her tortious interference with prospective advantage claim. (Docket No. 32 at 24).

[11]     Nicassio actually cites *Fun-Damental Too, Ltd v. Gemmy Indus.*, 111 F.3d 993 (2d Cir. 1997), which does not discuss passing off. (Docket No. 32 at 24). It appears that Nicassio instead intended to cite *Fun-Damental Too, Ltd. v. Univ. Music Group, Inc.*, 1997 WL 381608, *5 (E.D. Pa. 1997), which the Court quotes *infra*.

claim, whether governed by the law of Pennsylvania or New York, is preempted by Section 301 of the Copyright Act. *See Kitchen & Bath Concepts of Pittsburgh, LLC v. Eddy Homes, Inc.*, 2016 WL 7404559, *5 (W.D. Pa. 2016) (holding that because the plaintiff's unfair competition claim under Pennsylvania law was best characterized as "reverse passing off," the claim was the "equivalent" to its copyright infringement claim and preempted by Section 301 of the Copyright Act); *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 322 (S.D.N.Y. 2010) ("[R]everse passing off does not constitute an extra element for preemption purposes because it is essentially a claim for unauthorized use of copyrightable material.").

As such, Nicassio's unfair competition claim at Count III of the complaint, whether assessed under Section 43(a) of the Lanham Act or state law, fails to state a claim.

### 3. Tortious Interference and Destruction Claims – Counts IV and V

Moving on to Nicassio's state law claims for "tortious interference with prospective advantage" and "tortious destruction of intellectual property," Defendants correctly assert that these claims are preempted by Section 301 of the Copyright Act because they are likewise the equivalent of a claim for copyright infringement. (Docket Nos. 19 at 23-25, 34 at 14). The complaint alleges that Defendants are liable for tortious interference because they willfully interfered with her contractual agreement for the manufacture, distribution, and publication of paper copies of *Rocky* and her "hope" of negotiating "the sale of the exclusive right to *Rocky* to Hallmark for the 2017 holiday season." (Docket No. 1 at ¶¶ 23, 34, 45, 68, 69). Nicassio's tortious destruction claim is similarly premised on her allegations that Defendants' acts of infringement and dissemination of *Albert* have impaired and reduced the value of *Rocky*. (*Id.* at ¶ 70). In response, Nicassio again

does not identify any way in which either of these claims contain an "extra element" for preemption purposes.[12]  (Docket No. 32 at 24).

In any event, the tortious interference with prospective advantage claim is preempted by Section 301 of the Copyright Act because it is solely based on her right to prevent unlawful interference of her right to manufacture, distribute, and publish *Rocky* – rights which are exclusively protected by the Copyright Act.  *See Tegg Corp. v. Beckstrom Elec. Co., 650 F.Supp.2d 413, 428-29 (W.D. Pa. 2008)* (concluding that the tortious interference claim under Pennsylvania law was preempted by Copyright Act because "Plaintiff's ultimate claim is based on its right to prevent unlawful interference with its right to distribute and reproduce its copyrighted software and databases to current and future parties, and create for those parties derivative works based on its copyrighted software and databases" and its allegations regarding breach of confidentiality were not an element of a tortious interference claim); *Gary Friedrich Enters., LLC v. Marvel Enters., 713 F. Supp. 2d 215, 228 (S.D.N.Y. 2009)* (same, where claim was governed by New York law, because it sought to redress the exclusive rights to publish, copy and distribute a manuscript under one's own name).  By the same token, the tortious destruction of intellectual property claim is preempted by Section 301 of the Copyright Act because it is based on Defendants' alleged acts of infringement and their dissemination of *Albert*, as well as the alleged resulting impact on her exclusive rights to derive financial benefits from *Rocky*.  *See Daley, 2006 WL 148879*, at *6 ("Plaintiff essentially argues that the defendants' illegal distribution of plaintiff's literary works interferes with plaintiff's exclusive rights to distribute the works and derive financial benefits therefrom.  Such a claim is preempted by federal law.").

---

[12]     Moreover, the cases that she cites in this section of her brief actually relate to her state law unfair competition claim.  *See* note 10, *supra*.

Preemption aside, Nicassio fails to state a claim for tortious interference with prospective advantage because the complaint does not allege any well-pleaded facts suggesting that Defendants purposefully acted to harm or interfere with Nicassio's existing and/or prospective contracts, which is a requirement under both Pennsylvania and New York law.  *See Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000) (Pennsylvania); *Gary Friedrich Enters., LLC*, 713 F.Supp.2d at 228 (New York); *see also Culinary Svc. of Del. Valley, Inc. v. Borough of Yardley*, 385 Fed. App'x 135, 143 (3d Cir. 2010) (affirming dismissal of a tortious interference claim that was merely based on conclusory and speculative allegations).  She also fails to state a claim for tortious destruction of intellectual property because, as Defendants highlight, it does not appear to be a recognized cause of action in either New York or Pennsylvania.  (Docket Nos. 19 at 23-24; 34 at 14).[13]

Accordingly, the complaint fails to state a claim for the asserted state law causes of action for "tortious interference with prospective advantage" and "tortious destruction of intellectual property" at Counts IV and V.

### 4. Leave to Amend is Denied

"Plaintiffs in ordinary civil litigation … must take affirmative steps to obtain amendment in the face of dismissal."  *Mullin v. Balicki*, 875 F.3d 140, 151 (3d Cir. 2017).  To this end, it is a long-standing rule in the Third Circuit that "to request leave to amend a complaint, the plaintiff must submit a draft amended complaint to the court so that it can determine whether amendment would be futile."  *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007).  Because Nicassio has not requested leave to amend her complaint, let alone presented the Court with a proposed amended pleading, the Court declines to *sua sponte* extend her the opportunity to do so.  *See Garza v. Citigroup Inc.*, ___ Fed. App'x ___, 2018 WL 678140,

---

[13]     Nicassio did not respond to this argument, other than to call it "meaningless," without any legal support.  (Docket No. 32 at 24).

*4 (3d Cir. 2018) ("Our precedent is clear that district courts act within their discretion when they reject undeveloped requests for leave to amend that … are unaccompanied by a proposed amended pleading.  For that reason alone, the District Court did not abuse its discretion when it refused to grant leave to amend before judgment…").

To be sure, even if Nicassio had requested leave to amend, the Court would nevertheless deny her request as futile.  "Futility" in this context "means that the complaint, as amended, would fail to state a claim…"  *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).  All of the causes of action in Nicassio's complaint are deficient as a matter of law and there are no additional facts which she could plead to cure the above-described deficiencies.  Therefore, the Court denies Nicassio leave to amend her complaint.

## V.    CONCLUSION

For all of these reasons, Defendants' Motion to Dismiss [18] is GRANTED, and Nicassio's Complaint [1] is DISMISSED, WITH PREJUDICE.  Appropriate Orders to follow.

*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:    April 27, 2018.

cc/ecf:  All counsel of record.